Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2762 | **DATE** | 3/11/2004 |
| **CASE TITLE** | Katherine Briscoe, on behalf of Nelson Taylor, deceased, vs. Jo Anne B. Barnhart | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment [19-1] is granted and the Commissioner's motion for summary judgment is denied. This case is reversed and remanded to the Commissioner for an award of benefits based on an onset date of January 7, 1990.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 12 2004 | | 25 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 3/11/2004 | | |
| DK | courtroom deputy's initials | U.S. DISTRICT COURT CLERK | date mailed notice | | |
| | | | DK6 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KATHERINE BRISCOE, on behalf )
of NELSON TAYLOR, deceased, )
)
    Plaintiff, )
)    **Case No. 03 C 2762**
    v. )
)    **Magistrate Judge Morton Denlow**
JO ANNE B. BARNHART, )
Commissioner of Social Security, )
)
    Defendant. )

DOCKETED
MAR 1 2 2004

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff, Katherine Briscoe, on behalf of Nelson Taylor, deceased, ("Plaintiff"), seeks judicial review of the decision of JoAnne B. Barnhart, the Commissioner of Social Security ("Commissioner"), which determined that Plaintiff's disability onset date is not prior to the expiration of Plaintiff's insured status, and denied Plaintiff Social Security Disability Insurance Benefits ("DIB") under 42 U.S.C. §§ 416(i), 423. This case is before the Court on cross motions for summary judgment. The ultimate issue to be resolved is the onset date of Plaintiff's disability because Plaintiff already is in Supplemental Security Income ("SSI") pay status and his insured status for Title II benefits expired on March 31, 1991.

Plaintiff contends that the onset date of his disability is March 1, 1987. Plaintiff further contends that the Commissioner's decision should be reversed and remanded for an

25

award of benefits because the Administrative Law Judge ("ALJ") (1) did not properly apply Social Security Ruling 83-20 ("SSR 83-20") as mandated by Magistrate Judge Arlander Keys' prior decision; (2) based his credibility determination of Lola Taylor on an unreasonable inference and an incorrect factual finding; (3) did not consider the testimony of Dr. Abramson, the Commissioner's medical expert ("ME"); (4) did not properly determine whether the vocational expert ("VE") relied on sound principles and methods; (5) did not resolve a discrepancy between the VE's testimony and the Dictionary of Occupational Titles ("DOT"); and (6) did not make a literacy determination. Alternatively, Plaintiff requests that this matter be reversed and remanded for additional proceedings. For the following reasons, Plaintiff's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. The case is remanded to the Commissioner to award benefits based on an onset date of January 7, 1990.

## II. BACKGROUND FACTS

### A.    PROCEDURAL HISTORY

On May 1, 1993, Plaintiff applied for SSI. R. 254. The Social Security Administration ("SSA") granted the application, and Plaintiff was put into SSI pay status as of the date of his application. R. 119.

On December 11, 1996, Plaintiff filed an application for DIB under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416, 423, claiming disability as a result of poor circulation in the legs and alleging an onset date of March 1, 1987, the last date Plaintiff was

2

employed. R. 56-58, 98. The application was denied initially and upon reconsideration. R. 23, 28. On June 27, 1997, Plaintiff requested a hearing before Administrative Law Judge ("ALJ") B. Carlton Bailey, Jr., which was held on March 18, 1998. R. 35, 208-47. ALJ Bailey determined that Plaintiff was not disabled prior to the expiration of his insured status on March 31, 1991, because his impairments were not "severe" during that time.[1] R. 11-20. On July 28, 2000, the Appeals Council denied Plaintiff's request for review. R. 5-7. The ALJ's determination consequently became the final decision of the Commissioner.

Plaintiff then filed a complaint in district court. On September 6, 2001, Magistrate Judge Arlander Keys reversed the decision of the ALJ and remanded Plaintiff's claim to the Commissioner for supplemental proceedings. *Taylor v. Massanari*, No. 00 C 5643, 2001 WL 1035286, at *9 (N.D. Ill. Sept. 7, 2001). In particular, Judge Keys found that the ALJ (1) failed to apply Social Security Ruling 83-20, which pertains to determining the onset date of a claimant's disability; (2) improperly relied upon gaps in Plaintiff's treatment in assessing the severity of his condition; and (3) failed to obtain Plaintiff's 1993 SSI application file, or alternatively, to explain why he proceeded without it. *Id.* at *6-9.

On November 1, 2002, ALJ Bailey held a supplemental hearing. R. 315-65. Plaintiff was deceased at the time of the second administrative hearing; he passed away on June 7, 2002. R. 309. On January 29, 2003, the ALJ issued a decision finding that Plaintiff was not disabled prior to January 7, 1994, and thus was not disabled prior to the expiration of his

---

[1] In order to be entitled to DIB, an individual must establish disability while insured for benefits. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131; *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

3

insured status on March 31, 1991. R. 251-64. Plaintiff again seeks judicial review of the ALJ's decision. Katherine Briscoe, Plaintiff's sister, was substituted as party in interest and continues to pursue Mr. Taylor's claim for disability benefits.

## B.    HEARING TESTIMONY

The evidence presented at the March 18, 1998 hearing ("1998 hearing") included the testimony of Plaintiff, the testimony of the Commissioner's ME, Dr. Richard Abramson, and medical records. R. 209-47. The evidence presented at the November 1, 2002 hearing ("2002 hearing") included the testimony of Plaintiff's long-time partner, Lola Taylor, a different medical expert, Dr. Ashok Jilhewar, and a VE, Richard Hamersma. R. 315-65.

### 1.    Plaintiff's Testimony - 1998 Hearing

Plaintiff was born January 27, 1941. R. 219. He had a fifth grade education, he did not read or write well, and he could not understand a lot of words when attempting to read a newspaper. R. 240, 246. Plaintiff worked at a steel mill as a forklift and machine operator for ten years until 1986. R. 238-39. He then worked as a forklift operator for the Leaf Brand Company. R. 237-38. On March 1, 1987, Plaintiff quit because his legs bothered him; driving a forklift requires constant foot movement, which caused him significant leg pain. R. 238.

By early 1987, Plaintiff experienced difficulty when walking. R. 221-22. The pain would start after he walked approximately one-half block, forcing him to stop, sit-down, and

massage his left leg. R. 222-23. After Plaintiff stopped working, his life changed "a lot." R. 245. His pain prevented him from helping with chores around the house, visiting with friends, and taking part in favorite pastimes. *Id.*

In late 1993 or early 1994, Plaintiff developed a leg ulcer that would not heal. R. 225. By 1994, he could walk only ten or twelve steps without stopping or sitting down. R. 223-24. In 1994, Plaintiff had an operation because there was a block in a main artery. R. 224. After that surgery, Plaintiff could walk about two blocks. R. 227. Shortly thereafter, Plaintiff had corrective surgery to alleviate stomach pain. R. 229. Following his surgery, his doctor instructed him not to lift anything heavier than twenty pounds. R. 245.

### 2. Lola Taylor - Domestic Partner - 2002 Hearing

Lola Taylor testified for Plaintiff at the 2002 hearing. R. 329-41. She and Plaintiff lived together for seventeen years, although they never married and had no children. R. 329. Ms. Taylor states that Plaintiff stopped working in 1987 because he could no longer perform his job duties. R. 330. He would come home and complain about his leg giving him problems. *Id.* Plaintiff developed a sore on his left leg a couple months after he stopped working. R. 331. Prior to that time, Plaintiff had cramps in his leg about every half hour both day and night. R. 332-33. The left leg bothered him first, with pain in the middle of his calf. R. 331. Plaintiff woke up frequently during the night because of the pain, and the pain was worse during the night than during the day. R. 332. Ms. Taylor had to rub the cramps out of his legs. R. 335. The cramps grew worse in August of 1991. *Id.* As a result, Plaintiff

ceased driving, and he and Ms. Taylor began walking their destinations. R. 338.
Furthermore, when Plaintiff would remove the snow off the porch or take out the garbage,
he had trouble breathing. R. 338, 339.

### 3.    David Abramson, M.D. - Medical Expert - 1998 Hearing

Dr. David Abramson testified as the ME at the 1998 hearing. R. 220-37. He is board
certified in internal medicine with a sub-speciality in cardiovascular diseases. R. 45. Dr.
Abramson was reluctant to give an opinion regarding the onset of Plaintiff's disability
because he could not study the period from 1987 through 1991 to determine Plaintiff's actual
impairment. R. 232. Dr. Abramson stated that the only way to determine the onset date of
Plaintiff's disability would be to obtain the treatment records, or any circulation tests, from
that time period in order to see whether there was any reference to absence or reduction of
pulses in the groin or whether arteriosclerosis obliterans were present in Plaintiff's lower
extremities. *Id.*

Plaintiff had disabling conditions in 1994, but Dr. Abramson was unsure how long the
conditions existed. R. 236. It was clear that by 1994 Plaintiff suffered from very severe
arteriosclerosis obliterans and a block in the abdominal aorta. R. 232-34. These conditions
did not develop suddenly but rather progressed slowly, allowing sufficient time for new
vessels to grow. *Id.* Plaintiff also suffered from intermittent claudication, which causes pain
when the muscles are being exercised. *Id.* Additionally, Plaintiff had a leg ulcer in 1994
that had been present for approximately six months. R. 234. The fact that the ulcer was

6

present for six months and did not heal indicated to Dr. Abramson that its cause was impaired arterial circulation. R. 234-35. Plaintiff's condition was probably disabling one year prior to Plaintiff's 1994 surgery, but Dr. Abramson could not say whether the condition went back to 1987 without some objective proof. *Id.* Dr. Abramson had no way of knowing how long it took the condition to develop because in some cases it takes three years to develop, but in other cases it may take longer or shorter depending on the person's metabolism. R. 236. He was certain, however, that it didn't happen in six months because a complete occlusion of the aortic vifercation is a slow process. *Id.* With regard to specific work-related limitations, Plaintiff had no limitations on his ability to lift, carry, sit, or stand, but he would have some problems with walking. R. 243.

### 4.  Ashok Jilhewar, M.D. - Medical Expert - 2002 Hearing

Dr. Ashok Jilhewar testified as a medical expert at the 2002 hearing. R. 341-58. From Dr. Jilhewar's analysis of the medical records, Plaintiff's extremities were reportedly normal on December 1, 1986, January 14, 1987, December 20, 1988, January 6, 1989, and January 7, 1990. R. 342-43. January 7, 1990 is the date of the first medical note in which a doctor referenced a complaint by Plaintiff of leg cramping. R. 350-51. The doctor also prescribed 400 mg of Trental for the claudication on that day, which "is strong evidence that the doctor was thinking of a peripheral vascular disease." R. 351, 354. However, Dr. Jilhewar does not know if the doctor took peripheral pulses at that time or if he did anything else to come to his conclusions. R. 351-52. Consequently, one can not make a judgment

about the severity of the peripheral vascular disease to establish whether it was severe under the Act. R. 354.

The medical notes dated February 5, 1991, also mention pain in Plaintiff's left leg. R. 343. During the February 5, 1991 visit, there were no objective findings in Plaintiff's extremities; the medical note indicates that the findings from the examination were merely subjective: "extremities pain, left leg." *Id.* The note does not say "positive," "negative," or "pulses," so Dr. Jilhewar could not interpret with any certainty what the note means. R. 343-44. The note orders Plaintiff to continue treatment at home, but Dr. Jilhewar did not know what that treatment was. R. 344.

It is possible that Plaintiff was having symptoms from peripheral vascular disease as early as 1987, or in 1991. R. 352. However, the cramping in Plaintiff's legs or calves would not be consistent with intermittent claudication. *Id.* In Dr. Jilhewar's practice, cramping is much more common than claudication, and he often does not find any cause for the cramping, or a cause related to vascular disease. R. 352-53. Given the sparsity of the documentation, Plaintiff may have had claudication, but Dr. Jilhewar is uncertain. R. 353.

With regard to Plaintiff's residual functional capacity, prior to January 7, 1990, "there was no establishment of any restrictions, or any affect on the residual functional capacity." R. 354. After January 7, 1990, Dr. Jilhewar did not know how much of a physical limitation Plaintiff had, and Dr. Jilhewar could not make any inference except that Plaintiff was affected. R. 354. Dr. Jilhewar's patients with this condition can usually do "light work with

8

a sit and stand option." R. 356. "Light work" means that they can lift twenty pounds occasionally and ten pounds frequently. *Id.* However, Dr. Jilhewar does not know if Plaintiff could have performed this level of work. *Id.* Plaintiff would have had to avoid markedly cold weather because it could cause the precipitation of gangrene. *Id.* Plaintiff also would have to avoid commercial driving and exposure to dust, fumes and gases because an x-ray in 1994 indicated that he had the beginning of emphysema requiring the avoidance of all concentrated pulmonary irritants. R. 356-57.

### 5. Richard Hamersma - Vocational Expert - 2002 Hearing

Richard Hamersma, the VE, testified at the 2002 hearing. R. 358-64. He was informed that Plaintiff could perform work at the light level of exertion but could not be exposed to marked temperature changes or humidity, and could not drive automotive equipment or be exposed to concentrated dust, fumes, or gases. R. 360. The VE determined that none of Plaintiff's past relevant work could have been performed at the light level of exertion. R. 359. However, an individual with Plaintiff's vocational profile could perform 8,000 jobs as an assembler, 7,000 jobs as a hand packager, and 6,500 jobs as an inspector. R. 360-61. Although these jobs are classified as light jobs due to the weight involved, they are performed primarily in the seated position. R. 361-63. The VE obtained these figures from the County Business Patterns put out by the Illinois Department of Security.[2] R. 363.

---

[2] The County Business Patterns is a source of occupational information published by the Bureau of the Census. 20 C.F.R. § 404.1566(d)(2). The information from this source aids the SSA in determining disability at step five in the sequential analysis of 20 C.F.R. § 404.1520, and the SSA will take administrative notice of the reliable job information published in this source.

These sources do not discuss the availability of light jobs that allow the individual to sit while performing the work. *Id.* The VE determined that the identified jobs allow for a sit/stand option from his personal observations, talking to employers, doing job analysis, and surveys. *Id.* The identified jobs were consistent with the information in the Dictionary of Occupational Titles.[3] *Id.*

## C.    MEDICAL RECORDS

### 1.    Medical Records Before Expiration of Insured Status

Although Plaintiff's SSI file was not available at either administrative hearing, the record does contain some medical evidence covering the period prior to the expiration of Plaintiff's insured status. Plaintiff was treated at the Chicago Hamlin Medical Center ("Hamlin") between 1985 and the expiration of his insured status on March 31, 1991. R. 136-44.

On December 1, 1986, Plaintiff complained of being nauseated and dizzy, and he was referred to Belmont Hospital to rule out an intra-abdominal tumor. R. 141. The December 15, 1986, treatment note from Hamlin is mostly illegible, but it does indicate that Plaintiff was to be released to return to work on January 5, 1987. R. 140. The January 14, 1987

---

*Id.*

[3] The Directory of Occupational Titles is published by the Department of Labor and it is used by the SSA at steps four and five of the sequential analysis to determine disability under 20 C.F.R. § 404.1520. The SSA relies primarily on this publication for information regarding job requirements in the national economy. *Id.* The SSA will take administrative notice of reliable job information published in this source. 20 C.F.R. §§ 404.1566(d), 416.966(d).

medical note reveals that Plaintiff complained of a cough and a cold, which he had experienced for one week. R. 142. There are no medical notes in the record for 1988. The January 9, 1989 medical notes indicate that Plaintiff complained of weight loss and dizziness. R. 137.

The January 7, 1990 medical note indicates that Plaintiff complained of cramping in his leg. R. 137-38. Plaintiff's leg cramped in the back when he walked a block or so. R. 138. Additionally, Plaintiff did not obtain the "GI" x-rays ordered the previous year because he could not afford it. R. 137. Furthermore, Plaintiff was assessed as being unable to walk more than a block and was given a prescription for Trental. R. 138. Finally, the assessment ruled out peripheral vascular insufficiency. *Id.* The February 5, 1991 medical notes indicate that Plaintiff again complained of pain in his left leg. R. 136. The notes indicate that Plaintiff should continue treatment at home. *Id.*

### 2.  Medical Records After Expiration of Insured Status

Plaintiff did not return to Hamlin Hospital until May 28, 1993, after the expiration of his insured status. R. 135. At that time, he claimed that he could not walk for more than one block without resting, was short of breath, walked with a cane, and had pain in his left leg. *Id.*

One year later, Plaintiff was hospitalized at St. Elizabeth's Hospital from June 14, 1994 through July 1, 1994, due to abdominal aorta occlusion, ulcer of lower limbs, obstructive chronic bronchitis, cellulitis of the leg, and abscesses of the leg. R. 174. Plaintiff

11

was diagnosed with a non-healing ulcer of the left leg, severe vascular occlusive arterial disease, chronic bronchitis, and emphysema. R. 176.

A June 17, 1994 Consultation Report for vascular surgery at St. Elizabeth's indicates a long-standing history of claudication pain in the lower extremities, with severe hip pain lasting six to seven months, and a non-healing ulcer in the left lower leg that started over two months earlier and has increased in size. R. 192. On June 24, 1994, Plaintiff underwent an aorta-iliac femoral bypass and repair of the blood vessels. R. 174.

On August 9, 1994, Plaintiff had a CT scan of the abdomen at St. Elizabeth's Hospital. R. 150. The CT Scan Report indicates that findings were compatible with small bowel obstruction. R. 167. On August 13, 1994, Plaintiff returned to St. Elizabeth's Hospital for a lysis of peritoneal adhesions, dilation of the colon, and lysis of perineal or periureteral adhesions. R. 149.

## D.    THE OPINION BY MAGISTRATE JUDGE KEYS

On September 6, 2001, Magistrate Judge Keys vacated the unfavorable 1998 ALJ decision and remanded Plaintiff's claim to the Commissioner for supplemental proceedings. *Taylor*, 2001 WL 1035286, at *9. Judge Keys found that the ALJ (1) failed to apply SSR 83-20; (2) improperly insisted on documented medical diagnosis of Plaintiff's condition prior to March 31, 1991; and (3) failed to fully develop the record. *Id.*

The ALJ had improperly applied the consistency standard set out in SSR 83-20 by rejecting Plaintiff's alleged onset date without determining whether it was consistent with

12

the medical evidence. R. 285-86. Contrary to SSR 83-20, the ALJ rejected Plaintiff's testimony because there was no objective proof of his alleged onset date. R. 288-89. However, SSR 83-20 does not require the Plaintiff to produce conclusive results from specific medical tests in order to establish an onset date. R. 289. SSR 83-20 directs the ALJ to consult with Plaintiff's previous employers, physicians, family members, and/or friends when the medical evidence is insufficient. *Id.* Because the ALJ and Dr. Abramson repeatedly stated that they believed the medical evidence was insufficient, the ALJ should have sought additional testimony to assist in determining an onset date. *Id.*

The ALJ also failed in his obligation to fully develop the record. R. 290-91. The record was not fully developed because (1) the ALJ failed to ascertain why Plaintiff did not seek more frequent medical treatment for his pain, and (2) the ALJ failed to acquire or to consult the missing 1993 SSI file deemed "critical" by Plaintiff, the ALJ, and the medical expert at the first administrative hearing, or alternatively, to explain why he proceeded without the file. R. 290-93. Judge Keys ordered supplemental proceedings not inconsistent with his opinion. R. 294.

### E.     2003 ALJ DECISION

On January 29, 2003, ALJ Bailey issued a second unfavorable decision, finding that Plaintiff was not disabled prior to the expiration of his insured status on March 31, 1991. R. 251-61. In his second opinion, the ALJ did not mention SSR 83-20. The ALJ also did not consider the 1993 SSI file, and his decision did not explain why he proceeded without it.

Finally, the ALJ heard testimony from Plaintiff's long time partner, Lola Taylor, but found her "not totally credible." R. 260.

The ALJ's decision that Plaintiff was not disabled prior to the expiration of his insured status was based on two determinations. First, the ALJ determined that the available medical evidence did not support a finding that his disability was "severe." R. 257. Second, the ALJ determined that Plaintiff was able to perform a significant number of jobs in the economy involving "light work." R. 260.

In making his first determination, the ALJ emphasized the sparsity of the medical evidence. R. 259. First, ALJ Bailey noted that there was not sufficient information to support an onset date prior to the date last insured. *Id.* Additionally, he noted that although Plaintiff's extremities were reportedly normal, or not mentioned, at doctor's visits on December 1, 1986, January 14, 1987, December 20, 1988, January 6, 1989, and January 7, 1990, there were no objective findings made about the extremities on February 5, 1991, the day Plaintiff first complained of pain in his legs. R. 256-57. The ALJ emphasized Dr. Jilhewar's statements that he could not make the inference from the record that the condition existed prior to January 7, 1994, although it was possible Plaintiff had intermittent claudication in 1987. *Id.* The ALJ stated that he "had the same difficulty as the medical expert in fixing an onset date," and that "an inference must be based on sufficient information to enable one to make an educated guess." R. 259. Finally, the ALJ noted that

the information provided was too scattered and contradictory to enable him to make more than a plain unvarnished guess, which was not sufficient. *Id.*

The ALJ doubted the sufficiency of the testimony of Plaintiff's longtime partner, Lola Taylor. R. 258. Her memory was remarkably detailed and unwavering, yet there was no testimony that she had a photographic or even a remarkable memory. *Id.*

Because the ALJ had determined that Plaintiff's disability was not severe prior to the expiration of his insured status, he went on to determine whether Plaintiff's residual functional capacity allowed him to perform either his past relevant work or a significant number of existing jobs in the economy. R. 257. Plaintiff had not engaged in substantial gainful activity since the alleged onset date of his disability on March 1, 1987, and Plaintiff was unable to perform his past relevant work. R. 258, 260. However, Plaintiff's residual functional capacity at the time allowed him to perform a significant range of light work. R. 259, 261. Plaintiff could not perform the full range of light work, given his exertional limitations; however, there were a significant number of jobs in the national economy that he could perform, including jobs as an assembler (8,000 jobs), hand packager (7,000 jobs), and inspector (6,500) jobs. *Id.*

## III. LEGAL STANDARDS

### A. STANDARD OF REVIEW

A reviewing court in a disability case is limited to determining whether the ALJ's final decision is supported by substantial evidence and based on the proper legal criteria. *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). Determinations of

fact must be affirmed by the reviewing court if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Substantial evidence is "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The reviewing court reviews the entire record, but it may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron*, 19 F.3d at 333. If conflicting evidence allows reasonable minds to differ, the responsibility for that decision falls on the Commissioner or her designee, the ALJ. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

However, the ALJ is not entitled to unlimited judicial deference. *Ehrhart*, 969 F.2d at 538. First, the ALJ must consider all relevant evidence. *Herron*, 19 F.3d at 333. Although it is not necessary that he evaluate in writing every piece of evidence in the record, the ALJ can not pick and choose which evidence he will weigh. *Id.* Additionally, the ALJ must articulate his analysis of the evidence at some minimal level. *Id.* In order to permit meaningful appellate review, the ALJ must state his reasons for accepting or rejecting entire lines of evidence. *Id.* at 333-34. Most importantly, the ALJ "must build an accurate and logical bridge from the evidence to his conclusions." *Clifford v. Apfel*, 227 F.3d 863, 872

(7th Cir. 2000). Lastly, although the claimant bears the burden of demonstrating his disability, the ALJ must build a full and fair record. *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991).

An ALJ's failure to fulfill his obligation to build a full and fair record is good cause to remand for gathering additional evidence. *Id.* at 586. Additionally, when the ALJ's decision is not supported by substantial evidence, generally a remand for further proceedings is appropriate. *Campbell v. Shalala*, 98 F.2d 741, 744 (7th Cir. 1993). However, even if the ALJ's decision is not supported by substantial evidence, and there is not one supportable conclusion in favor of a plaintiff, a court may still remand the case for an award of benefits if the ALJ was obdurant in complying with the law of the case. *See Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir. 1998).

## B. DISABILITY STANDARD

The ALJ uses a five-step sequential analysis in order to determine if an individual is disabled. 20 C.F.R. § 404.1520. The sequential evaluation ends if the ALJ, at any step of the process, determines that the claimant is not disabled. *Id.* The ALJ must inquire: (1) whether the claimant is working and whether the work is a substantial gainful activity; (2) whether the claimant's impairment is severe; (3) whether the impairments meet or equal a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant is able to perform his past relevant work; and (5) whether the claimant's age, education, and past relevant work experience in reference to his residual functional capacity ("RFC") enable him

17

to do other work. *Id.* A person's RFC is what he can do despite any physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). The burden of proof is on a claimant through step four of the analysis, and the burden then shifts to the Commissioner at step five. *Clifford*, 227 F.3d at 868.

## C.    DETERMINING AN ONSET DATE

Another rule applies when determining the onset date of a claimant's disability. To be entitled to disability benefits under the Act, one must be insured at the same time that the evidence establishes the presence of a disabling condition. 20 C.F.R. § 404.130-32; *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). SSR 83-20 controls the determination of the onset date of a disability. *Lichter v. Bowen*, 814 F.2d 430, 434 (7th Cir. 1987) (citing SSR 83-20, 1983 WL 31249, at *1). If the disability is of a nontraumatic origin, the ALJ should consider three factors in determining the onset date: (1) the claimant's alleged onset date, (2) the claimant's work history, and (3) any medical evidence or all other relevant evidence. *Id.* (citing SSR 83-20, 1983 WL 31249, at *2).

The date alleged by a claimant is the starting point of the analysis. *Id.* If the onset date alleged by the claimant is consistent with the medical and other evidence available, SSR 83-20 requires the ALJ to adopt that date. SSR 83-20, 1983 WL 31249, at *3. However, the date a claimant stops working is of great significance when selecting an onset date. *Id.* at *2. Moreover, the medical evidence is described as the primary element in the onset determination. *Id.* Where the medical evidence lacks an indication of the precise onset date, and the disabling condition appears to have begun prior to the date of the first recorded

medical examination, the ALJ should seek the assistance of a medical advisor to help infer the onset date. *Id.* Where it is not possible to make a reasonable inference from the available evidence, it may be necessary to explore other sources, such as information from family, friends, and former employers, to determine why the medical evidence is not available and to obtain additional evidence regarding the history of the claimant's condition. *Id.*

Vocational evidence in some cases may be relevant to the determination of an onset date. *Id.* at *2. Social Security Ruling 83-20 describes this form of evidence as particularly relevant with slowly progressive impairments. *Id.* The Ruling notes: "[I]t is not necessary for an impairment to have reached listing severity . . . before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began." *Id.*

Objective medical evidence is a "useful indicator" in determining whether a claimant was disabled. 20 C.F.R. § 404.1529(c)(2). However, when determining whether a disabling condition exists, lack of objective medical evidence substantiating claims of pain can not be the sole basis for rejecting the claimant's allegations. *Id.* According to Social Security Ruling 96-7p ("SSR 96-7p"), when a finding of a disabling condition can not be made solely on objective medical evidence, the ALJ must carefully consider the claimant's alleged symptoms along with all the other relevant evidence in the record in assessing the credibility of the claimant's statements. SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. 1996). Specifically, if Plaintiff claims that symptoms of pain affected his ability to work, this

evidence can not be disregarded solely because it is not substantiated by objective medical evidence. *Id.*

## IV. ANALYSIS

Plaintiff argues that the ALJ's decision should be reversed for six reasons. In particular, Plaintiff contends that the ALJ (1) did not properly apply SSR 83-20 as mandated by Judge Keys; (2) based his credibility determination of Lola Taylor on an unreasonable inference and an incorrect factual finding; (3) did not consider the testimony of Dr. Abramson; (4) did not properly determine whether the VE relied on sound principles and methods; (5) did not resolve a discrepancy between the VE's testimony and the DOT; and (6) did not make a literacy determination. Each of the aforementioned issues will be discussed in turn.

## A. THE ALJ DID NOT PROPERLY APPLY SOCIAL SECURITY RULING 83-20 AS MANDATED BY JUDGE KEYS.

The law of the case doctrine requires the ALJ to conform further proceedings on remand to the principles set forth in Judge Keys' opinion unless there is a compelling reason to depart. *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998). Judge Keys indicated that SSR 83-20 set the standard for determining the onset date. Once again, the ALJ did not properly apply SSR 83-20 because the ALJ (1) did not determine whether the alleged onset date was inconsistent with the medical evidence, (2) did not obtain the SSI file, or alternatively, explain why he proceeded without it, and (3) did not properly consider Plaintiff's testimony.

1.   **The ALJ did not determine whether the alleged onset date was inconsistent with the medical evidence.**

The ALJ analyzed this case inconsistently with Judge Keys' opinion and SSR 83-20. The ALJ did not ascertain whether the alleged date was inconsistent with the medical evidence. The ALJ did not even mention SSR 83-20. Although this omission by itself is not reversible error, *see Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989), the ALJ's reasoning indicates that he did not apply the consistency standard from SSR 83-20. Instead, the ALJ incorrectly relied on the lack of corroborating medical evidence. This approach was in direct contradiction to the opinion of Judge Keys. Judge Keys noted that at the first administrative hearing the ALJ was mistaken in believing that Plaintiff was required to produce conclusive medical evidence in order to establish an onset date. *Taylor*, 2001 WL 1035286, at *7. SSR 83-20 provides that "in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established." SSR 83-20, 1983 WL 31249, at *2.

In his second opinion, the ALJ stated that he adopted the opinion of Dr. Jilhewar. R. 257. However, neither Dr. Jilhewar nor Dr. Abramson opined that Plaintiff's alleged onset date of March 1987 was inconsistent with the medical evidence. On the other hand, the ALJ acknowledged that Dr. Jilhewar's opinion was based on a lack of objective medical evidence. *Id.* However, Judge Keys specifically stated that SSR 83-20 contemplates the possibility of

21

determining an onset date absent corroborating medical documentation. *Taylor*, 2001 WL 1035286, at *7. In fact, under SSR 83-20, the ALJ may not rely on the first date of diagnosis simply because an earlier diagnosis date is unavailable. *Lichter*, 814 F.2d at 435. The first date of diagnosis does not control the determination of the onset date. *Id.*

The ALJ erroneously continued to require objective medical evidence when he stated that "an inference must be based on sufficient information to enable one to make an educated guess." R. 259. However, according to Judge Keys, the issue is not whether there is sufficient information to make an educated guess, but rather whether the date alleged by Plaintiff is consistent with the medical evidence. *Taylor*, 2001 WL 1035286, at *5. The ALJ did not follow Judge Keys' directive and improperly applied SSR 83-20.

### 2. The ALJ improperly dismissed the testimony of Plaintiff from the March 1998 administrative hearing.

Plaintiff argues that the ALJ erred in not considering his testimony from the 1998 administrative hearing. Because the only articulation of Plaintiff's testimony is in the ALJ's first opinion, wherein the ALJ erroneously dismisses it for lack of corroborating medical evidence, the ALJ improperly failed to reconsider Plaintiff's allegations of pain and physical limitation.

In the 2003 opinion, the only mention of Plaintiff's testimony was that "even if [the ALJ] accepted [Plaintiff's] allegations and sufficient medical evidence supported them . . . it is doubtful that any benefits could be paid." R. 259-60. This indicates that the ALJ

considered Plaintiff's testimony, rejected it, and found that it was not corroborated by the medical evidence. *Id.* Although subjective credibility determinations will not be disturbed on appeal unless patently wrong, *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003), the ALJ may not reject a claimant's testimony solely because there is not substantiating objective medical evidence, *see* 20 C.F.R. § 404.1529(c)(2).

The Commissioner argues that the ALJ was not required to address Plaintiff's statements. The Commissioner erroneously reasons that the ALJ did not have to consider Plaintiff's testimony because the ALJ found Ms. Taylor's testimony not credible and Ms. Taylor's statements essentially corroborated Plaintiff's testimony. The Commissioner's reliance upon *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), is misplaced. In *Carlson*, the Seventh Circuit determined that the ALJ did not have to consider the testimony of the claimant's wife because it was repetitive of the claimant's testimony, but the Court noted that such a scenario is distinguishable from a situation in which the ALJ failed to discuss uncontradicted testimony by the claimant himself. *Carlson*, 999 F.2d at 181.

Moreover, SSR 83-20 requires the ALJ to consider lay testimony when the medical evidence is insufficient to allow for a proper inference as to the onset date. SSR 83-20, 1983 WL 31249, at *3. SSR 83-20 also indicates that Plaintiff's allegations should be the starting point of the analysis. *Id.* at *2. Thus the ALJ's failure to consider Plaintiff's testimony was contrary to SSR 83-20.

### 3. The ALJ failed to obtain the SSI file, or alternatively, to explain why he proceeded without it.

Plaintiff maintains that the ALJ failed to obtain the SSI file, or alternatively, to explain why he proceeded without it, in direct contravention of Judge Key's order. Dr. Abramson, Plaintiff, and the ALJ considered the SSI file to be critical in determining the progression of Plaintiff's disability and, therefore, whether Plaintiff was disabled on or before March 31, 1991. R. 214, 216, 218, 292. Consequently, Judge Keys determined that the ALJ should have at least explained why he proceeded without the file, even though he did not have an absolute duty to obtain it. R. 292-93. This obligation to explain himself is pursuant to the ALJ's duty to build a full and fair record. *See Thompson*, 933 F.2d at 585.

The ALJ indicated at the 2002 hearing that he would again attempt to obtain the file or explain his reasoning for proceeding without it. R. 322. However, there is no indication in the record that the ALJ obtained this file, and there is no explanation in his opinion regarding why he rendered a decision without it. This is inconsistent with Judge Keys' opinion. *See* R. 293. Additionally, this failure is contrary to the requirement of SSR 83-20 that the ALJ secure any additional medical evidence in the file concerning the onset date. SSR 83-20, 1983 WL 31249, at *3 ("If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.").

## B.     THE ALJ'S CREDIBILITY DETERMINATION OF LOLA TAYLOR WAS PATENTLY WRONG.

Plaintiff argues that the ALJ's credibility determination of Lola Taylor is based on an unreasonable inference and an incorrect factual finding. Specifically, Plaintiff argues that the ALJ incorrectly based his credibility determination on a lack of testimony that Ms. Taylor has a remarkable or photographic memory. Plaintiff also argues that the credibility determination was based erroneously upon her inability to identify individuals who could corroborate that she lived with Mr. Taylor for seventeen years.

An ALJ's credibility determinations will not be overturned unless they are patently wrong. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). An ALJ's credibility determination deserves special deference because the ALJ is in the best position to observe a witness. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). However, when credibility determinations are based on objective factors or fundamental implausibilities, appellate courts have greater freedom in reviewing the ALJ's finding. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ stated in his opinion that Ms. Taylor had a remarkably detailed memory of Plaintiff's daily activities, sleeping habits, and the ability to ambulate from 1987 to 1991. R. 258. The ALJ contrasted this testimony with his finding that Ms. Taylor was unable to name at the hearing any other person, such as ministers, siblings, or friends, who could corroborate her testimony that she had been living with Plaintiff for seventeen years. R. 258.

25

Accordingly, the ALJ did not find her testimony to be credible. However, this rationale is fundamentally flawed because Ms. Taylor was never questioned on this matter. Instead, the ALJ asked her who would be able to testify concerning Plaintiff's ability to work in 1987. R. 325-27. Ms. Taylor responded that half of Plaintiff's former co-workers were deceased and she didn't know many of them. R. 326. It is not unreasonable that she could not name Plaintiff's former co-workers from more than fifteen years ago. The rationale for the ALJ's credibility determination is based on an incorrect factual finding. Given this error, the ALJ has failed to build a logical bridge between the evidence and his credibility conclusion. *See Clifford*, 227 F.3d at 872. Because the ALJ's credibility finding of Ms. Taylor is premised on an erroneous factual finding, it is patently wrong.

## C.     THE ALJ WAS JUSTIFIED IN NOT ARTICULATING A CONSIDERATION OF DR. ABRAMSON'S TESTIMONY.

Plaintiff argues that the ALJ erred by neither discussing the testimony of Dr. Abramson nor articulating an explanation for its rejection. Plaintiff maintains that failure to consider Dr. Abramson's testimony affected the determination of Plaintiff's RFC. In particular, Plaintiff points to Dr. Abramson's testimony, which states that pain from intermittent claudication can be brought on by standing still. Plaintiff argues that this testimony contrasts with Dr. Jilhewar's testimony that patients only experience claudication while walking. Plaintiff maintains that an RFC based on Dr. Abramson's testimony would not have included the ability to perform light work since light work involves lifting weight

while standing. The ALJ is not required to evaluate in writing every piece of testimony presented, but the ALJ may not ignore an entire line of evidence. *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). However, in this case, Dr. Abramson's testimony does not constitute an entire line of evidence mandating separate consideration because Dr. Abramson's testimony does not materially contrast with Dr. Jilhewar's testimony. *See Carlson v. Shalala*, 999 F.2d 180,181 (7th Cir. 1993).

Dr. Abramson qualified his statement that the pain can arise while standing by noting that there must be continuous movement of the legs thereby requiring circulation to those muscles. R. 237. More importantly, Dr. Abramson stated that there would not be a problem with standing because it is a minor activity that does not put on enough of a load such that it significantly decreases circulation. R. 243. Therefore, Dr. Abramson's testimony does not materially supplement or contradict Dr. Jilhewar's statements that the symptoms of insufficient claudication arise when walking or using the leg muscles. R. 357. Dr. Abramson's testimony is repetitive of the findings of Dr. Jilhewar regarding Plaintiff's RFC, and thus the redundancy rationale from *Carlson* applies.

Similarly, the other relevant portions of Dr. Abramson's testimony are essentially corroborated by Dr. Jihlewar. Both experts indicated that the lack of objective medical tests prior to the expiration of Plaintiff's insured status was the basis for their inability to establish an onset date during this time. R. 232, 354. Moreover, both Dr. Abramson and Dr. Jilhewar were unable to dismiss the possibility that Plaintiff's disabling condition existed prior to the

expiration of his insured status. R. 236, 352-53. Finally, both doctors indicated that they were unable to infer an earlier onset date based on the sparsity of the medical evidence provided. R. 232, 236, 354. Because Dr. Jilhewar corroborated the important parts of Dr. Abramson's testimony, the ALJ was justified in not articulating his consideration of Dr. Abramson's testimony in his second opinion.

## D. THE VOCATIONAL EXPERT'S TESTIMONY IS IRRELEVANT TO THE ONSET DATE ISSUE.

The ALJ utilized the expertise of VE Richard Hamersma in order to ascertain whether there were a significant number of jobs in the national economy that Plaintiff could have performed. SSR 83-20 indicates that consideration of vocational factors can contribute to the determination of an onset date particularly in the case of slowly progressive impairments that have not reached listing severity based on medical evidence. SSR 83-20, 1983 WL 31249, at *2. However, the vocational evidence referred to in SSR 83-20 refers to a plaintiff's work history, not the testimony of a vocational expert. *Id.* The Plaintiff in this case was out of work since 1987. Therefore, the VE's testimony is irrelevant to the onset date issue.

## F. THE ALJ'S LITERACY DETERMINATION IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

Finally, Plaintiff argues in his reply brief that the ALJ failed to make a literacy determination. If Plaintiff was found to be illiterate, then he is disabled given his age and the fact that he was found to have no transferable skills. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.09; R 260. Illiteracy is a level of education created by the SSA in order to determine

one's ability to meet vocational requirements. *Id.* § 404.1564(b)(3). Education is assessed by considering Plaintiff's schooling and any other training. The importance placed on formal schooling may vary depending upon how much time has lapsed between the completion of the schooling and the beginning of the impairment and also upon what Plaintiff did with his education in a work or other setting. Thus the last completed numerical grade level may not be representative of Plaintiff's educational abilities. However, if there is no other evidence to contradict it, then Plaintiff's numerical grade level is used to determine his educational level. *Id.*

There are four categories of education: illiteracy, marginal education, limited education, and high school education and above. *Id.* § 404.1564(b)(1)-(3). Illiteracy is defined as an inability to read or write, and generally an illiterate person has little or no formal schooling. *Id.* § 404.1564(b)(1). Plaintiff is considered illiterate if he cannot read or write a simple message such as instructions or inventory lists, even though he can sign his name. *Id.* If a plaintiff has a marginal educational level, then he has an ability in reasoning, arithmetic, and language skills, which are needed to do simple, unskilled types of jobs. *Id.* § 404.1564(b)(2). Generally, formal schooling at a sixth grade level or lower is a marginal educational level. *Id.* If Plaintiff has a limited education, then he has an ability in reasoning, arithmetic, and language skills, but not enough to allow him to do most of the more complex job duties needed in semi-skilled or skilled jobs. *Id.* § 404.1564(b)(3). Generally, a formal education of at least seventh grade and up to the eleventh grade is a limited education. *Id.*

The ALJ found that Plaintiff had a limited education. R. 260. Thus, the ALJ made a finding regarding Plaintiff's educational level. *Id.* However, Plaintiff's testimony contradicts the finding of a limited education because Plaintiff testified that he had a fifth grade education, R. 240, thereby initially placing him in the marginal education category. In contrast, Plaintiff's Disability Report indicates that he had an eighth grade education, R. 115, thereby initially qualifying his educational level as limited. Regardless of this discrepancy, there is substantial evidence in the record that Plaintiff was not illiterate. Although he testified that he could not read or write well, and that he could not understand a lot of words when attempting to read a newspaper, R. 240, 246, these facts do not sufficiently contradict the ALJ's determination such that Plaintiff's formal education is not indicative of a higher level of education. An inability to read or write well, or an inability to understand words in a newspaper, does not necessitate a finding that Plaintiff was unable to perform minimal literary endeavors similar to writing simple messages such as instructions or inventory lists. *See* 20 C.F.R. § 404.1564. Furthermore, Plaintiff testified that he can read and write a little bit, and when he does read, he likes to read the newspaper. R. 240. There is substantial evidence in the record indicating that Plaintiff was not illiterate, and thus the ALJ was not required to find him disabled under 20 C.F.R. § 404, Subpt. P, App. 2, 202.09.

## G. THE ALJ'S DECISION SHOULD BE REVERSED FOR AN AWARD OF BENEFITS AS OF JANUARY 1990.

Generally, when an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is the appropriate remedy. *Campbell v. Shalala*, 98 F.2d 741, 744 (7th Cir. 1993). An award of benefits is appropriate only if all factual issues have been resolved and the "record can yield but one supportable conclusion." *Id.* In such cases, further administrative proceedings would serve no useful purpose but would only delay the receipt of benefits. *Parks v. Sullivan*, 766 F. Supp. 627, 638 (N.D. Ill. 1991). Therefore, the proper remedy for errors is not an automatic award of benefits but rather a remand for further proceedings. *Gotz v. Barnhart*, 207 F. Supp. 2d 886, 903 (E.D. Wis. 2002).

However, the Commissioner is not entitled to "endless opportunities to get it right." *Seavey v. Barnhart*, 276 F.3d 1, 13 (1st Cir. 2001); *Miller v. Chater*, 99 F.3d 972, 978 (10th Cir. 1996). A court may step in and award DIB when the agency has displayed "obduracy" in complying with the law of the case. *Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir. 1998). In this case, the obduracy doctrine permits the Court to award Plaintiff DIB when the Commissioner fails to follow the reviewing court's clear direction, even though there is not substantial evidence to support a finding of not disabled, and thus more than one supportable conclusion.

For example, the court in *Wilder v. Apfel*, automatically awarded DIB to the claimant because of the "obduracy" evidenced by the Social Security Administration. 153 F.3d at 804.

In *Wilder*, the Court of Appeals, which had previously remanded the case, reviewed the district court's decision to affirm the Commissioner's denial of benefits, found no reasoned basis for the denial, and reversed the district court's ruling. *Id.* The court did not find that the record yielded one supportable conclusion, but rather found that the new evidence "left the case exactly where it was the last time." *Id.* Nonetheless, the court refused to remand the case to the Commissioner for further proceedings. *Id.* at 801. In reaching its decision, the court pointed to the actions of the agency. *Id.* at 804. The ALJ's opinion, the court stated, was no more reasoned than the one that resulted in the remand, contained misstatements of evidence, ignored the instructions from the court's previous remand order, and relied on evidence not in the record. *Id.* at 802-04. In order "to bring the charade to an end," the court ordered the Commissioner to award the claimant the benefits for which she had applied. *Id.* at 801; *see also Rohan v. Barnhart*, No. 03 C 3029, 2004 WL 383294, at *14 (N.D. Ill. Feb 24, 2004) (awarding benefits rather than remanding for a third time because of the Commissioner's obduracy).

Likewise, this case warrants an automatic award of DIB due to obduracy by the ALJ. Not following the remand order of a district court evidences obduracy. *See Wilder*, 153 F.3d at 803. Additionally, under the law of the case doctrine, the law articulated by Judge Keys was binding upon the ALJ on remand. *See id.* Nevertheless, the ALJ ignored Judge Keys' opinion by failing to obtain the SSI file, or alternatively, to explain why he proceeded without it, and by applying an analysis inconsistent with the standard articulated by Judge Keys.

The SSI file was deemed critical by the ALJ, Dr. Abramson, and the Plaintiff. R. 214, 216, 218, 292. It contained information that led the SSA to find Plaintiff eligible for SSI disability benefits in 1993. Judge Keys noted its importance and mandated that the ALJ obtain the file, or alternatively, explain why he proceeded without it. *Taylor*, 2001 WL 1035286, *9. Yet, the ALJ issued a second decision without mentioning the 1993 SSI file.

Moreover, Judge Keys' explanation of the applicable legal standard was also ignored. Judge Keys stated that SSR 83-20 controlled the determination of onset date and that Plaintiff's alleged onset date must be accepted unless it is inconsistent with the medical evidence. *Taylor*, 2001 WL 1035286, at *7. Judge Keys also stated that it was erroneous for the ALJ to insist on medical documentation diagnosing Plaintiff's condition. *Id.* at *9. Nonetheless, as stated above, the ALJ again did not apply SSR 83-20 and instead, for a second time, erroneously relied on a lack of objective medical evidence. *See* R. 257, 259. These obdurate acts by the ALJ warrant reversal for an award of benefits.

Plaintiff stated in his reply brief and during oral argument that January 1990 is the most reasonable onset date. *See* Pl. Reply Br., at 9. Moreover, an onset date of January 7, 1990 is consistent with the medical evidence for the following reasons. First, Plaintiff testified that he stopped working in 1987 due to pain in his legs. R. 238. Additionally, a medical note dated January 7, 1990 indicates that Plaintiff complained of leg cramping to his treating physician. R. 137-38, 343. The note further indicates that the doctor prescribed 400 mg of Trental, which Dr. Jilhewar indicated was "strong evidence that the doctor was

thinking of peripheral vascular disease." R. 137-38, 351, 354. Finally, both medical experts testified that an onset date prior to the expiration of Mr. Taylor's insured status was possible. R. 236, 347, 352-53. Specifically, Dr. Jilhewar stated that a diagnosis of peripheral vascular disease back to 1987 or 1991 was not inconsistent with the medical records. R. 352-53.

This Court refuses to grant the ALJ a third chance to "get it right." This case is remanded for an award of benefits as of January 7, 1990, given the obduracy demonstrated by the ALJ in failing to follow Judge Keys' opinion, and the consistency between the alleged onset date of January 7, 1990 and the medical evidence, as evaluated pursuant to SSR 83-20.

## III. CONCLUSION

For the reasons set forth in this opinion, Plaintiff's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is reversed and remanded to the Commissioner for an award of benefits based on an onset date of January 7, 1990.

SO ORDERED THIS 11th DAY OF MARCH, 2004.

_Morton Denlow_

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Barry A. Schultz
Law Offices of Barry A. Schultz, P.C.
1609 Sherman Avenue
Suite 207
Evanston, IL 60201

**Counsel for Plaintiff**

Kathryn A. Beverly
Special Assistant United States Attorney
200 West Adams Street
30th Floor
Chicago, IL 60606

**Counsel for Defendant**